**NATIONAL HOCKEY LEAGUE PLAYERS' ASSOCIATION,
Plaintiff,**

v.

**NATIONAL HOCKEY LEAGUE,
Defendant.**

**No. 98 C 90.**

United States District Court,
N.D. Illinois,
Eastern Division.

July 8, 1998.

Michael P. Conway, Michael T. Donovan, Grippo & Elden, Chicago, IL, for Plaintiff.

Joseph Baumgarten, Howard Z. Robbins, Proskauer Rose, LLP, New York City, Thomas F. Bush, Jr., Thomas A. Doyle, Saunders & Monroe, Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

This action stems from an arbitration proceeding between National Hockey League Players' Association ("Association," the loser) and National Hockey League ("League," the winner)—hence federal jurisdiction over this contractual dispute between an association of employers and a labor organization representing employees exists under 29 U.S.C. § 185(a), with Association's action being brought under Federal Arbitration Act ("Act") § 10(a)(4), 9 U.S.C. § 10(a)(4).[1] Because each litigant believes that there are no material factual issues in dispute, each has moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment:

1. Association's Complaint (and hence its cross-motion under Rule 56) seeks to vacate the October 10, 1997 arbitration award ("Award") issued by arbitrator John Sands ("Sands" or the "Arbitrator" or "Im-

---

1. As the text reflects, the Act is one statute whose internal numbering matches the section numbering within the United States Code. Further refer-  ences to the statute will simply take the form "Act § —."

partial Arbitrator"—the latter being the term used in the parties' agreement under which the arbitration took place).

2. League had earlier begun the summary judgment activity by asking for dismissal of this action (with Association then filing its cross-motion).

For the reasons stated in this memorandum opinion and order, League's motion is denied while Association's is granted, and the Award is therefore vacated.

### Operative Standard

There is no quarrel between the parties as to the exceedingly narrow range of judicial review of arbitration awards that is permissible under Act § 10(a) and the case law that applies that section. Association's attack on the Award here stems from its contention that Arbitrator Sands exceeded the authority given to him by the parties—something that if true causes the Award to run afoul of Act § 10(a)(4), which provides for the vacation of an award "[w]here the arbitrators exceeded their powers...." As our Court of Appeals has put it in terms startlingly applicable to Association's version of events (*St. Mary's Med. Ctr. v. Disco Aluminum Prods. Co.*, 969 F.2d 585, 591 (7th Cir.1992)):

> If the federal policy embodied in the Arbitration Act is based on the enforcement of private agreements, we see no reason why the parties' agreement not to arbitrate is any less enforceable than their earlier agreement to arbitrate....

And similarly, *id.* at 590:

> Congress's goal in enacting the Arbitration Act was to place arbitration agreements "'upon the same footing as other contracts, where [they] belong.'" *Dean Whitter [sic] Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985)(quoting H.R.Rep. No. 96, 68th Cong., 1st Sess., (1924)). In other words, the federal policy embodied in the Arbitration Act is a policy favoring enforcement of contracts, not a preference for arbitration over litigation. See *id.* at 219–21, 105 S.Ct. at 1241–43.

That same principle had been announced by the Supreme Court in the strongest terms in *Volt Information Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 478–79, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

### Application of the Standard

In this instance the litigants' quarrel is not over the terms of their contractual commitment to arbitration as stated in their collective bargaining agreement ("CBA"), which is framed in classic all-encompassing terms. In that respect CBA Art. 17 sets out the procedure for the exclusive resolution of "[a]ny dispute (hereinafter referred to as a 'grievance') arising after the effective date of this Agreement and involving the interpretation or application of, or compliance with, any provision of this Agreement" (*id.* § 17.1), and that procedure involves the ultimate submission of unresolved grievances by submission to an Impartial Arbitrator (*id.* §§ 17.5 to 17.8). And *id.* § 17.8 expressly states:

> **Arbitrator's Decision and Award.** The Impartial Arbitrator will issue a written decision within thirty (30) days of the close of the record. The decision of the Impartial Arbitrator will constitute full, final and complete disposition of the grievance, as the case may be, and will be binding upon the player(s) and Club(s) involved and the parties to this Agreement; provided, however, that the Impartial Arbitrator will not have the jurisdiction or authority to add to, subtract from, or alter in any way the provisions of this Agreement or any NHL Player Contract or addenda. In resolving grievances, the Impartial Arbitrator has the authority to interpret, apply and determine compliance with any provision of this Agreement, or an NHL Player Contract. Otherwise, the Arbitrator shall have no authority to alter or modify the contractual relationship or status between a player and a Club, other than where such remedy is expressly provided for in this Agreement.

What happened here, though, is that the broad grant of authority contained in the CBA was modified by a mutually-agreed-upon limitation after the grievance at issue had been submitted to Sands as Impartial Arbitrator. That grievance had originally involved hockey player Kevyn Adams, but when his individual grievance was mooted by his signing with another League club,

League and Association nonetheless agreed to arbitrate the underlying "systems" issue that had been raised by the Adams grievance: whether the International Hockey League ("IHL" or simply "I") was an "affiliated league" of League itself, so that a player who signed with a club in IHL would be characterized as a "defected player" from League pursuant to CBA §§ 8.6(c) and 10.2(b)(i).

During the first day of the arbitration (July 23, 1997), Association presented some testimony from Association attorney Jeffrey Citron ("Citron") about some Association-League discussions regarding the definition of "defected player" that Citron said had taken place during the parties' 1994–95 collective bargaining negotiations. At that point League attorney L. Robert Batterman ("Batterman") stated that League contemplated presenting testimony inconsistent with Citron's, thus requiring Sands to make credibility determinations as between the witnesses. Sands responded by telling the lawyers for both sides that he thought such a procedure was not in anyone's best interest because such a credibility resolution could be harmful to the parties' relationship, so they immediately held a closed-door session and everyone (League counsel, Association counsel and Arbitrator Sands) agreed orally that Sands would not consider that earlier bargaining history. Here are the relevant portions of the affidavit by John McCambridge ("McCambridge"), the lawyer who represented Association in the arbitration, as to what happened thereafter (Aff. ¶¶ 21–25):

21. Mr. Batterman and I followed up on Arbitrator Sands' request to consider removing bargaining history from the case. I called Mr. Batterman in mid-August and told him that the NHLPA [Association] would agree to take "bargaining history" out of the case. He said that was fine with the NHL [League]. A short time later, I called Mr. Batterman back to confirm that the agreement applied to bargaining history from the 1994–95 negotiations and would not exclude events that took place prior to these negotiations. He agreed.

22. During all of these conversations, we (Mr. Sands, Mr. Batterman and I) referred to the matters to be excluded as "bargaining history." None of us ever said that the Agreement to exclude bargaining history applied only to certain bargaining history from the 1994–95 negotiations and that other bargaining history from the 1994–95 negotiations would be allowed.

23. Except for confirming that our agreement applied only to the 1994–95 negotiations, we did not qualify or limit in any way our agreement to exclude bargaining history from the case. Arbitrator Sands had no authority under our agreement to rely upon 1994–95 bargaining history to reach his decision.

24. When the hearing resumed in late August, Mr. Batterman and I advised Mr. Sands that the NHL and NHLPA had agreed to remove bargaining history from the case. When we gave these instructions to Mr. Sands, we referred to "bargaining history" generally; neither party said anything that would have indicated that the Agreement applied only to certain bargaining history from the 1994–95 negotiations and that other bargaining history from the 1994–95 negotiations could be considered by the Arbitrator. Mr. Sands acknowledged our agreement and moved forward with the hearing.

25. In reliance on the agreement with the NHL, the NHLPA presented no additional evidence relating to the 1994–95 CBA negotiations.

Batterman's affidavit on the subject is far fuzzier, though it obviously seeks to imply that the exclusion from the Arbitrator's consideration was of narrower scope than McCambridge's just-quoted affidavit has identified in more precise terms (Batterman Aff. ¶¶ 9–11):

9. During the first day of hearing, the Union presented testimony from Jeffrey Citron, Esq. (an attorney with the NHLPA) concerning alleged discussions between the Union and League during the parties' 1994–95 collective bargaining negotiations about the definition of the phrase "defected player" in CBA Article 10.2(b)(i).

10. During Mr. Citron's testimony, I stated to the arbitrator that the NHL was prepared to present testimony inconsistent

with Mr. Citron's, and that the arbitrator would be required to make credibility determinations concerning the witnesses. The arbitrator called a sidebar conference with Mr. McCambridge and me, and informed us that he did not believe it was in the parties' best interest for him to have to make such a credibility determination, and since it was likely that the conflicting testimony as to the contested bargaining history was likely to be "a wash," asked whether we could agree to remove it from the case.

11. At the outset of the August 27 hearing, the NHL and the Union orally agreed to the arbitrator's recommendation that he not consider evidence relating to the disputed bargaining history about which Mr. Citron had testified. This agreement was made orally and the submission agreement was not modified as a result of this agreement.

But when Batterman's deposition was taken, he repeatedly reconfirmed that "I don't recall the specific words" (Dep.47) that Sands had used to articulate his proposal to exclude bargaining history testimony, nor did he recall how the participants in the Sands–McCambridge–Batterman meeting "were referring to the testimony that would be excluded" (*id.* 51) or "[w]hat terms [they] were…using when [they] were talking about excluding the testimony" (*id.*). Finally, Batterman did not recall what Sands said about the three-person closed-door discussion concerning bargaining history when they returned to the conference room on July 23 and when Sands then summarized that discussion for the rest of the individuals attending the arbitration (*id.* 51–52). And perhaps most importantly, Batterman has said not a word in his affidavit about his discussions with McCambridge *after* the July 23 initial hearing that had involved the Citron testimony followed by the same day's closed-door meeting and Sands' report to those assembled there. On that score McCambridge Aff. ¶¶ 21–24 are precise and unequivocal and are not countered in any respect by what League

and its evidentiary submissions have provided. That being the case, McCambridge's (and hence Association's) version is therefore established for purposes of the Rule 56 cross-motions.

That turns out to be critical, because in material part Arbitrator Sands *did* look to the 1994–95 bargaining history (as to subjects that were or were not discussed there) in arriving at his conclusions in the Award (see, e.g., Award at 21–22). Although League insists that Sands would have come out the same way even without that reliance, and although Sands does state several reasons for reaching his conclusions, this Court knows from its personal experience (and from comparable comments by fellow judges with whom it has sat by designation on Courts of Appeals panels) that despite the verbiage used in judicial opinions, only the judicial officer himself or herself really knows whether the same result would have been reached if it had not been for the decisionmaker's reliance on a consideration that later proves to be erroneous or impermissible. That mind-reading function is not the appropriate role for a reviewing court, other than by the possible application of the doctrine of "harmless error." And particularly given the extremely narrow scope of judicial review of arbitrators' decisions—review that does *not* encompass the merits of those decisions as such—in this case the soundest approach is to leave the question to a trier of fact who has been chosen in the manner on which the parties have agreed in the CBA: an Impartial Arbitrator.

One final point should be added. Even if Batterman's less precise characterization of the scope of the bargaining history that was *not* to be considered by the Arbitrator were somehow to be credited,[2] Association would still prevail. In Award at 21 Sands—in the paragraph that begins "Second, bargaining history confirms that meaning"—relied on Association's assertedly having "never expressed to the League any different understanding of 'affiliated league's meaning'"—

---

**2.** That assumption is really unjustified, even in terms of the Rule 56 principle of drawing reasonable factual inferences in favor of the nonmovant. As already stated, Batterman does not

counter (indeed, does not even address) McCambridge's precise description of the post-July 23 discussions and agreement.

and Sands then went on to state in like vein (*id.*):

> Indeed, the parties agree that they never discussed that subject at all.

But Batterman's own Dep. 34 says that Citron had testified to precisely the opposite— "that [Association] had intended an effect on the definition of affiliated or unaffiliated as it related to the I in the case of an unsigned draft choice." And it was at that point that Batterman indicated that the League would bring in several witnesses who would contradict Citron's testimony (Dep.34–35). Thus League R. Mem. 6 says that the Citron testimony that triggered the parties' mutual agreement not to take bargaining history into account had been intended to show that Association "had articulated a view that the 1995 revisions to Article 10.2(b)(i)(A)(C) would affect the status of the IHL" as an "affiliated league." Thus it is clear that in issuing the Award, Arbitrator Sands considered even the more limited aspect of bargaining history that League would agree the parties had mutually agreed to exclude from consideration.

### Conclusion

As this opinion has reflected, this is not the usual case in which the question is whether an arbitrator has exceeded the scope of his or her authority so as to trigger the applicability of Act § 10(a)(4), with the court being called upon to decide that question by determining the legal meaning of the language in the litigants' written arbitration agreement. Instead what is at issue is a later oral agreement between the parties to such a written document—an oral understanding that cabined the scope of their arbitration to a greater extent than the written document had provided. There is no genuine issue of material fact in that respect,[3] and Association is entitled to a judgment as a matter of law. This matter must be returned to an Impartial Arbitrator for resolution of the parties' contested grievance without resort to the

1994–95 bargaining history. To that end the Award is ordered vacated.

---

3. As stated at the end of the preceding section, even if the facts were strained to create a dispute as to the terms of the parties' agreement, rather than by the proper crediting of McCambridge's precise recollection over Batterman's lack of recollection, the difference would not be material in the legal sense (that is, it would not be outcome-determinative).